

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

---

DWAYNE RANSOM DAVIS and MELISA
DAVIS, on behalf of themselves and all others
similarly-situated,

                              Plaintiffs,

vs.

COUNTRYWIDE HOME LOANS, INC.; BANK
OF AMERICA, N.A.; BAC GP, LLC; and BAC
HOME LOANS SERVICING, LP,

                             Defendants.

Case No. _____

**CLASS ACTION**

**JURY TRIAL DEMANDED**

**1:10-cv-1303 JMS-DML**

---

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

Plaintiffs Dwayne Ransom Davis and Melisa Davis, individually and as representatives

of the Class defined herein, by and through their undersigned counsel, for their Class Action

Complaint for Violations of the Racketeer Influenced and Corrupt Organizations Act against

Defendants, allege as follows:

### I.    INTRODUCTION

       1.      The protection of individual property rights is a cornerstone of American society

and its jurisprudence.  These rights are protected by well-established laws that provide the

necessary checks and balances to ensure that these rights are not violated.

       2.      Ignoring fundamental rights of property ownership, the Defendants and their

cohorts engaged in a pattern of racketeering activity in which they routinely and repeatedly

prepared perjured affidavits in order to rapidly churn foreclosures of the Plaintiffs' and other Class members' mortgages without the necessary information and documentation.

3.      These perjured affidavits were signed by so-called "robo-signers" who often signed hundreds per day and had no personal knowledge of their contents or accuracy.  The perjured affidavits were submitted to courts and sent through interstate mails and wires, all in furtherance and perpetuation of the fraud.  The robo-signers perjured themselves at the Defendants' direction by swearing that they had personal knowledge of information contained in the affidavits that they did not even read.

4.      The Defendants' and their enterprise's activities amounted to a conspiracy to undermine the justice system in foreclosure proceedings.  This foreclosure churning apparatus, through its multiple parts, allowed the Defendants to operate the Mortgage Foreclosure Mill Enterprise, throwing families from their homes with callous disregard for the basic protections of the law and established American notions of justice.

5.      As set forth below, the Plaintiffs and Class members are entitled to actual and statutorily-enhanced damages caused by the Defendants' fraudulent activities under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68. Plaintiffs and the Class members are also entitled to damages for Defendants' violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692.

6.      Although the fraudulent activity occurred in foreclosure proceedings, the Plaintiffs and Class do not seek to reopen or disturb the judgments in those foreclosures, and instead seek only monetary damages as a result of being prematurely evicted from their houses based on perjured affidavits.

## II.    PARTIES

7.    Plaintiff Dwayne Ransom Davis and Melisa Davis are residents of the State of Indiana who in March 2007 mortgaged their home located in Knightstown, Indiana, to Defendant Countrywide Home Loans, Inc.

8.    Defendant Countrywide Home Loans, Inc. ("Countrywide") is a Delaware corporation with its principal offices located in Calabasas, California.  Countrywide's registered agent for service in the State of Indiana is CT Corporation System, 251 E. Ohio St., Ste. 1100, Indianapolis, IN 46204.

9.    Defendant Bank of America, N.A. ("Bank of America") is a North Carolina corporation with its principal offices located in Charlotte, North Carolina.  Bank of America's registered agent for service in the State of Indiana is CT Corporation System, 251 E. Ohio St., Indianapolis, IN 46204.

10.    Defendant BAC GP, LLC, is a Nevada limited liability company with its principal offices located in Calabasas, California.  BAC GP, LLC is not registered with the Indiana Secretary of State; the address of its principal office is 4500 Park Granada, Calabasas, CA 91302.

11.    Defendant BAC Home Loans Servicing, LP is a California Limited Partnership, with its principal offices located in Woodland Hills, California, whose registered agent for service in the State of Indiana is CT Corporation System, 251 E. Ohio St., Ste. 1100, Indianapolis, IN 46204

12.    In July 2008, Bank of America acquired Countrywide.

3

## III.    JURISDICTION AND VENUE

13.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, and it is a class action brought by a citizen of a State that is different from the State where at least one Defendant is incorporated or does business.

14.    Jurisdiction is also appropriate under 28 U.S.C. § 1331, because the claims asserted by Plaintiffs arise under the laws of the United States of America.

15.    This Court's venue over this action is proper under 28 U.S.C. § 1391(a)(2) because the events or omissions giving rise to the claims asserted herein occurred in this district.

## IV.    CLASS ACTION ALLEGATIONS

16.    Plaintiffs bring this action on behalf of themselves and all others similarly situated, who are members of a Class composed of:

> All persons and entities whose property was foreclosed upon by the Defendants during the Class Period of October 18, 2006 to present.

(the "Class").  Excluded from the Class are:

A.    The officers and directors of the Defendants;

B.    Any robo-signers who participated in any way in foreclosures by Defendants;

C.    Any lawyers or law firms who represented Defendants in any foreclosure proceedings;

D.    Any judge or judicial officer assigned to this matter and his or her immediate family; and

4

E.      Any legal representative, successor, or assign of any excluded persons or entities.

17.     Plaintiffs' claims are made on behalf of themselves and all others similarly-situated under Rule 23 of the Federal Rules of Civil Procedure.

18.     Plaintiffs do not know the exact size of the Class but allege that the number of Class members numbers in the thousands so that joinder of all members is impracticable.

19.     There are questions of law and fact common to the Class, as set forth more particularly below.

20.     Plaintiffs are members of the Class, and their claims are typical of the claims of Class members generally. Plaintiffs' claims arise from the same conduct giving rise to the claims of the Class, and the relief Plaintiffs seek is common to the Class.

21.     Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are represented by competent counsel experienced in the prosecution of class action litigation. Plaintiffs' interests coincide with, and are not antagonistic to, those of the Class.

22.     Questions of law and fact common to all class members predominate over any questions affecting only individual class members. Predominating common questions include, without limitation:

A.      Whether Defendants participated in an association in fact and enterprise with the robo-signers and Defendants' lawyers in the Defendants' foreclosure actions;

B.      Whether one of the enterprise's fundamental purposes was to undermine the justice system through the use of perjured affidavits to prematurely deprive Plaintiffs of the ownership and use of their homes;

C.      Whether the enterprise engaged in a pattern of racketeering activity;

5

D.       Whether the enterprise committed acts of fraud on the courts, wire fraud, and mail fraud;

E.       Whether the enterprise knowingly prepared and submitted perjured affidavits to courts;

F.       Whether the enterprise's pattern of racketeering activity affected interstate commerce;

G.       Whether the Plaintiffs and Class members were harmed by Defendants' and the enterprise's wrongful acts; and

H.       The amount of any damages to which the Plaintiffs and Class are entitled in this action.

23.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Without a class action, individual Class members would face burdensome litigation expenses, deterring them from bringing suit or adequately protecting their rights. Absent class treatment, Plaintiffs and Class members are unlikely to receive damages or other relief from the Defendants' unlawful and wrongful conduct.

24.     The consideration of common questions of fact and law will conserve judicial resources and promote a fair and consistent resolution of these claims.

## V.     FACTUAL ALLEGATIONS

25.     By now, everyone is all too familiar with the rapid growth and eventual burst of the housing bubble over the past decade and the resulting erosion of the American economy. It is no secret that this devastating financial crisis was the result, in part, of irresponsible and opportunistic lending practices by the nation's biggest lenders, which resulted in a record number of foreclosures over the past several years.

6

26.    The Defendants' fraudulent conduct alleged in this Complaint traces its roots to the boom years of the housing market, when home prices were soaring and lenders pursued profit while paying little attention to the details and proper documentation of mortgage transfers and loan servicing.

27.    In their zeal to maximize profits from the soaring housing market, lenders and mortgage loan services—including Defendants—cut corners in the way they did business, ignoring and/or attempting to surreptitiously rewrite the most fundamental rules of how mortgages and promissory notes were generated, assigned, and recorded.  The ultimate goal was to "securitize" these mortgages by bundling them by the thousands into investment vehicles for Wall Street's consumption.

28.    While lenders and hedge fund managers were busy gambling with securitized blocks of ordinary peoples' mortgages, the bubble rapidly expanded and eventually burst, leaving in its wake thousands of borrowers with negative equity and unfavorable loans for which they were unable to make monthly payments.

A.    MERS

29.    One of the primary tools used by banks to shortcut traditional laws and procedures regarding mortgages, and to quickly transfer, bundle, and securitize mortgage loans, was the Mortgage Electronic Registration System ("MERS") that is owned and operated by MERSCORP, Inc., a Delaware corporation.

30.    MERS is owned by the country's biggest lenders, lender associations, and other industry giants, including the Mortgage Bankers Association of America, Fannie Mae, Freddie Mac, American Land Title Association, and various other mortgage companies, title insurers, and mortgage insurers.  In addition to the capital contributed by the shareholders, MERS has a

committed line of credit from Bank of America, guaranteed by the Mortgage Bankers

Association of America, Fannie Mae, and Freddie Mac.

31.     MERS describes itself as "an innovative process that simplifies the way mortgage

ownership and servicing rights are originated, sold and tracked.  Created by the real estate

finance industry, MERS eliminates the need to prepare and record assignments when trading

residential and commercial mortgage loans."  This is a fancy way of saying MERS is a tool to

bypass the established laws governing mortgage transfers and recording.

32.     According to its website, www.mersinc.org:

> MERS was created by the mortgage banking industry to streamline
> the mortgage process by using electronic commerce to eliminate
> paper.  Our mission is to register every mortgage loan in the
> United States on the MERS® System.

> Beneficiaries of MERS include mortgage originators, servicers,
> warehouse lenders, wholesale lenders, retail lenders, document
> custodians, settlement agents, title companies, insurers, investors,
> county recorders and consumers.

> MERS acts as nominee in the county land records for the lender
> and servicer. Any loan registered on the MERS® System is
> inoculated against future assignments because MERS remains the
> nominal mortgagee no matter how many times servicing is traded.
> MERS as original mortgagee (MOM) is approved by Fannie Mae,
> Freddie Mac, Ginnie Mae, FHA and VA, California and Utah
> Housing Finance Agencies, as well as all of the major Wall Street
> rating agencies.

33.     The mortgage bankers' impetus for creating MERS was a desire to save literally

hundreds of millions of dollars by shortcutting the long-established requirements for assignments

and recording of mortgages—which are in place to protect the property rights of

borrowers/mortgagors, as well as subsequent purchasers.  The ultimate objective was to make it

easier to serially transfer mortgages for eventual bundling and securitization without regard to

whether these transfers were legally or properly done.

34.     The *MERS Integration Handbook Volume One* laments the costs and hassles of

complying with the legal protections of private property rights established by law:

> In today's mortgage banking industry, a costly, time-consuming and paperintensive environment exists for all those involved in transferring and tracking mortgage rights. Investors transfer mortgage ownership rights using the same process as required by seventeenth century real property law. Note endorsements, mortgage assignments, and satisfaction documents must be prepared, verified, and delivered, and mortgage assignments and releases must be recorded. This process is cumbersome and paper-intensive, costing the mortgage industry hundreds of millions of dollars each year.

35.     MERS claimed to have "solved the problem" of complying with the bothersome

"real property law" which requires that note endorsements and mortgage assignments "must be

prepared, verified, and delivered … and must be recorded." According to the *MERS Integration*

*Handbook Volume One*:

> In recent years, the mortgage banking industry has used information technology to reduce costs for "back-office" and retail operations, but it continues to use paper-based methods to record and track mortgage rights. The tremendous amount of required manual intervention and paper processing that currently exists also perpetuates significant inefficiencies in document custody, loan and pool certification, and lien release processing activities.
>
> Based upon benefits realized from registry systems in other industries and validation that benefits are also realizable from a registry system in the mortgage banking industry, representatives from all participants in the mortgage industry concluded that an industry utility should be developed to electronically track the ownership of mortgage rights.
>
> MERSCORP, Inc., which owns and operates a national electronic registry called the MERS® System to track ownership and changes to ownership of mortgage rights, and Mortgage Electronic Registration Systems, Inc., its wholly owned and bankruptcy remote subsidiary which acts as the mortgagee of record in the public land records and as nominee for the lender and its successors and assigns, are referred to collectively as "MERS." When MERS is the mortgagee of record, MERS eliminates the

need for mortgage assignments, thereby improving the process and reducing the cost to transfer and track the ownership of mortgage rights and increasing the efficiency of the lien release process.

36.     However, the mere fact that MERS managed to come up with a convenient way for mortgage banks to avoid the legal methods of assigning and recording mortgage transfers, does not make that system legal or effective.

37.     In fact, as has been widely reported throughout the mortgage industry and popular press, the MERS system was poorly conceived and sloppily run, and it routinely lost track of mortgage ownership and vital documentation, including mortgages and promissory notes.

38.     As a result of the use of the faulty MERS system, lenders wishing to foreclose on mortgages found that it was frequently difficult, if not impossible, to accurately identify the holders of mortgages and notes, or to locate documents that were essential to initiating and pursuing foreclosure proceedings.

**B.     The Defendants' Frauds**

39.     When borrowers began to default in droves, banks found themselves in a never-ending game of catch-up, unable to devote enough manpower to modify, or ease the terms of, loans to millions of customers on the verge of losing their homes.  Simply put, banks were and are completely unprepared to deal with either working out problems with delinquent homeowners or the foreclosure process itself.

40.     As the number of borrowers defaulting on their mortgages steadily rose, the Defendants were faced with the dilemma of how to foreclose on these mortgages in light of the mess created by the use of the MERS system in particular, and more generally by the Defendants' writing and assigning more mortgages than they could keep up with.

41.     The Defendants recognized that actually determining the correct holders of the mortgages and notes, locating the mortgage and note documents, ensuring that the mortgages and notes were properly and legally assigned to the holders, and ensuring that all proper information and documentation was accurately assembled before initiating foreclosure proceedings, was not cost-effective for them.  Considering the sheer volume of mortgages at issue and the complexity of the iterative assignments and bundling of these mortgages, the task of sorting out the Defendants' tangled web was daunting.

42.     The Defendants did not have nearly enough qualified and experienced personnel to undertake this task, so the Defendants hired workers with minimal qualifications or work experience—what one industry insider characterized as the "Burger King kids."  Many of the workers did not understand basic concepts of mortgage lending, barely understood what a mortgage was, did not know what an affidavit was, and did not know what was meant by real property.

43.     The result was chaos, with Defendants often failing to identify the holders of mortgages and notes, or failing to locate essential documents related to mortgage transactions.

44.     However, the Defendants did not let their inability to locate essential information and documents stop them from promptly initiating foreclosure proceedings against the Plaintiffs and the Class members.  Instead, the Defendants directed their inexperienced and unqualified employees to prepare documents that were submitted in foreclosure proceedings, including without limitation affidavits containing essential allegations concerning the Defendants' purported mortgage rights.

45.     These affidavits were hastily prepared by the stack and eventually found their way to designated "robo-signers," who purported to sign the affidavits on behalf of the Defendants.

46. In actuality, and as has been widely reported and admitted during depositions by the robo-singers themselves, robo-signers signed the affidavits by hundreds, and had no actual knowledge of the facts contained therein.

47. Based on the sheer volume of affidavits being signed by these individuals, it would have been physically impossible for the robo-singers to actually review the information and documents that they swore to in their affidavits.

48. The Defendants knew that the affidavits were perjured, but nevertheless submitted the affidavits to courts in foreclosure proceedings around the country, using these fraudulent documents to take people's homes prematurely in disregard for their private property rights.

49. In each instance that perjured affidavits were submitted to courts in foreclosure proceedings, those affidavits were submitted by lawyers for the Defendants, who knew that the affidavits were perjured at the time of such submissions.

50. The purpose of Defendants' fraud was to undermine the administration of justice so as to allow them to circumvent the problems created by their use of MERS and to, illegally, allow them to foreclose upon property more quickly and cheaply than they otherwise would have been able.

## C. The Plaintiffs' Mortgage and Foreclosure Based on Defendants' Frauds

51. In March 2007, Plaintiffs mortgaged their property located in Knightstown, Indiana, to "Mortgage Electronic Registration Systems, Inc. ('MERS'), (solely as nominee for lender), as hereinafter defined, and Lender's successors and assigns, as mortgagee." The mortgage instrument defined the "Lender" as Countrywide Home Loans, Inc.

52. After Plaintiffs allegedly defaulted on their monthly payments, Countrywide on January 30, 2008 filed a Complaint to Foreclose Mortgage in the Rush County, Indiana, Superior

Court under Case Number 70D01-0802-MF-017 (the "Davis Foreclosure Case"). A copy of that Complaint is attached as Exhibit A.

        **i.**      **The Perjured Selman Affidavit**

53.      On April 4, 2008, Countrywide filed a Motion for Summary Judgment in the Davis Foreclosure Case. Among the attachments to that Motion for Summary Judgment was an Affidavit of Mortgagee and Non-Military Affidavit executed by Keri Selman on March 17, 2008 (the "Selman Affidavit"), which is attached as Exhibit B.

54.      The Selman Affidavit provided as follows:

> I, Keri Selman, being first duly sworn on oath, depose and state as follows:
>
> 1.      I am Assistant Vice President of the Plaintiff-Mortgagee herein and in that capacity am familiar with the books and records of Plaintiff, have personally examined the same, and am duly authorized to make this affidavit on behalf of Plaintiff and, if sworn as a witness, could competently testify to the facts contained herein.
>
> 2.      I have read the allegations in the Complaint, examined all exhibits, have personal knowledge of the facts stated therein and state that all of the allegations of the Complaint are true of my own personal knowledge.
>
> 3.      The Plaintiff is the holder of the promissory note sued upon and of the mortgage given as security thereof.
>
> 4.      The default of said Mortgagors occurred on the 1st day of October, 2007 and that said default has not been cured and Plaintiff has elected to claim the entire balance due in accordance with the terms of the mortgage and promissory note, and that there is now due and owing the Plaintiff the following sums plus attorney fees and court costs: [figures omitted]
>
> 5.      The mortgage lien and interest of the Plaintiff is prior to and superior to the lien and interest of all Defendants herein.
>
> 6.      To the best of affiant's knowledge, information and belief no defendant in said cause is now, nor was at the time of the filing

13

of this action, engaged in any branch of the military or naval service of the United States.

I affirm, under the penalties for perjury, that the foregoing representations are true.

/s/ Keri Selman
Keri Selman, Assistant Vice President

[NOTARIZATION]

55.     Selman is a nationally known robo-signer, and, in fact, has been called a "robo-signer extraordinaire."

56.     Robo-signers such as Selman are essential in executing the conspiracy underlying Defendants' racketeering activity.

57.     Selman has signed affidavits in support of foreclosures on behalf of numerous lenders and other entities, representing herself as a Vice President of Countrywide Home Loans, Inc.; a Vice President of Wells Fargo Bank, N.A.; an Attorney in Fact for Bank of New York; and an Assistant Vice President of Mortgage Electronic Registration Systems, Inc.

58.     Selman's prolific career signing affidavits as a supposed vice president for so many entities led Judge Arthur M. Schack of the Supreme Court of the State of New York to remark in a court order that "Ms. Selman is a milliner's delight by virtue of the number of hats she wears." Judge Selman noted that "Plaintiff's application is the third application for an order of reference received by me in the past several days that contain an affidavit from Keri Selman … ." Judge Schack said he was concerned that Ms. Selman might be engaged in a subterfuge, wearing various corporate hats, and ordered that, before he would grant an application for an order of reference, Selman would be required to submit another affidavit describing her employment for the last three years. Selman never submitted such an affidavit.

59.     Given the volume of such affidavits that Selman and other robo-signers executed on a daily basis, the statements in the Selman Affidavit are necessarily perjured.  It would be impossible, for example, for Selman to actually read the allegations in the complaint in the Davis Foreclosure Case and to and examine all of the exhibits thereto, which collectively span 15 pages—as she swore she did in paragraph 2 of the Selman Affidavit—and still read all of the accompanying documentation to all of the other affidavits she signed that same day.  The allegation in paragraph 2 was false, and Selman knew it was false when she made it.

60.     It would also be impossible for Selman to have personal knowledge of the facts stated in the complaint and attached exhibits in the Davis Foreclosure Case—as she swore she did in paragraph 2 of the Selman Affidavit—and to also have such personal knowledge as to the matters referenced in all the other affidavits she signed that same day.

61.     The Plaintiffs and the Court in the Davis Foreclosure Case relied on the statements in the Selman Affidavit at the time Defendants were foreclosing on their property.  The Plaintiffs and the Court had no way of knowing at the time that Selman was a robo-signer, that it would have been impossible for Selman to review the documents and information as described in her affidavit, and that the statements in her affidavit were otherwise perjured.

## ii.     The Perjured Viveros Affidavit

62.     On July 20, 2009, Defendants filed an Updated Affidavit of Mortgage and Non-Military Affidavit executed by Melissa Viveros on July 2, 2009 ("Viveros Affidavit") in the Davis Foreclosure Case, which is attached as Exhibit C.  The Viveros Affidavit as part of Defendants' request that the Plaintiffs' home be sold at a sheriff's sale and that a deficiency judgment be entered against Plaintiffs.

63. The Viveros Affidavit, which is essentially identical to the Selman Affidavit,

provided as follows:

> I, Melissa Viveros, being first duly sworn on oath, depose and state
> as follows:
>
> 1. I am Vice President of the Plaintiff-Mortgagee herein and
> in that capacity am familiar with the books and records of Plaintiff,
> have personally examined the same, and am duly authorized to
> make this affidavit on behalf of Plaintiff and, if sworn as a witness,
> could competently testify to the facts contained herein.
>
> 2. I have read the allegations in the Complaint, examined all
> exhibits, have personal knowledge of the facts stated therein and
> state that all of the allegations of the Complaint are true of my own
> personal knowledge.
>
> 3. The Plaintiff is the holder of the promissory note sued upon
> and of the mortgage given as security thereof.
>
> 4. The default of said Mortgagors occurred on the 1st day of
> May, 2008 and that said default has not been cured and Plaintiff
> has elected to claim the entire balance due in accordance with the
> terms of the mortgage and promissory note, and that there is now
> due and owing the Plaintiff the following sums plus attorney fees
> and court costs: [figures omitted]
>
> 5. The mortgage lien and interest of the Plaintiff is prior to
> and superior to the lien and interest of all Defendants herein.
>
> 6. To the best of affiant's knowledge, information and belief
> no defendant in said cause is now, nor was at the time of the filing
> of this action, engaged in any branch of the military or naval
> service of the United States.
>
> I affirm, under the penalties for perjury, that the foregoing
> representations are true.
>
> _/s/ Melissa Viveros_
> Melissa Viveros, Vice President
>
> [NOTARIZATION]

64. The Viveros Affidavit was perjured on its face in a number of ways. First of all, contrary to her sworn statement, Viveros was not a vice president of the Plaintiff-Mortgagee— i.e. Countywide Home Loans, Inc.—at the time she signed this affidavit in July 2009, nor was she even employed by Countrywide at that time. Rather, she has been employed by BAC GP, LLC as General Partner of BAC Home Loans Servicing, LP, since July 2007.

65. The Viveros affidavit was also perjured because she did not and could not have actually personally examined the books related to the Plaintiffs' loan, and could not have read the allegations in the Complaint, examined all exhibits, or had personal knowledge of the facts stated therein. Contrary to her sworn statement, "all of the allegations of the Complaint" were **not** "true of my own personal knowledge." Viveros Affidavit, ¶ 2.

66. Like Selman, Melissa Viveros is a known robo-signer. She discloses publicly on her LinkedIn profile that she manages a team of 340 foreclosure specialists for Bank of America, and handles "a portfolio size of approximately 140,000 specialty, subprime, VA, FHA accounts ensuring that state foreclosure timelines were met accordingly."

67. Given the sheer volume of foreclosures and affidavits Viveros handles, the statements in the Viveros Affidavit are necessarily perjured. It would be impossible for Viveros to actually read the allegations in the complaint in the Davis Foreclosure Case and to examine all of the exhibits thereto, which collectively span 15 pages—as she swore she did in paragraph 2 of her affidavit—and still read all of the accompanying documents to all of the other affidavits she signed that same day. The allegation in paragraph 2 was false, and Viveros knew it was false when she made it.

68. It would also be impossible for Viveros to have personal knowledge of the facts stated in the complaint and attached exhibits in the Davis Foreclosure Case—as she swore she

17

did in paragraph 2 of the Viveros Affidavit—and to also have such personal knowledge as to the matters referenced in all the other affidavits she signed that same day.

69.     The Plaintiffs and the Court in the Davis Foreclosure Case relied on the statements in the Viveros Affidavit at the time Defendants were foreclosing on their property. The Plaintiffs and the Court had no way of knowing at the time that Viveros was a robo-signer, that it would have been impossible for Viveros to review the documents and information as described in her affidavit, and that the statements in her affidavit were otherwise false.

70.     Robo-signers such as Viveros are essential in executing the conspiracy underlying the Defendants' racketeering activities.

71.     As a result of the Plaintiffs' and Court's reliance on the statements in the Selman and Viveros Affidavits, the Plaintiffs' property was foreclosed upon and eventually sold in a sheriff's sale. The Plaintiffs lost their home in disregard of the law.

## VI.   FIRST CLAIM FOR RELIEF – VIOLATIONS OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 19 U.S.C. § 1961, *et seq.*

### A.   The Enterprise

72.     At all times relevant to this Complaint and its allegations, Defendants; the individual robo-signers who signed affidavits in support of Defendants' foreclosure actions against the Plaintiffs and the Class members; and the law firms who submitted the perjured affidavits to courts in those foreclosure proceedings, associated in fact and constituted an enterprise (the "Mortgage Foreclosure Mill Enterprise") within the meaning of 18 U.S.C. § 1961(a)(4).

73.     The members of the Mortgage Foreclosure Mill Enterprise associated for the purposes of undermining the justice system by churning out mortgage foreclosures in the quickest and cheapest manner possible, without regard for compliance with the law, and

conducted their activities through a pattern of racketeering activity involving repeated and systematic frauds on courts, mail fraud, and wire fraud.

**B.** **Effect on Interstate Commerce**

74. The Mortgage Foreclosure Mill Enterprise engaged in and affected interstate and foreign commerce, including, but not limited to: the sale, transfer, and foreclosure of real property affecting interstate commerce; the sale, transfer, and assignment of notes in interstate commerce; and the creation and sale of securities in interstate commerce.

**C.** **Racketeering Activity**

75. In furtherance of its illicit purposes, the Enterprise conducted and participated in a pattern of racketeering activity, including fraud on the courts handling foreclosure proceedings against the Plaintiffs and the Class Members, and mail and wire fraud in furtherance of these frauds on the courts and the Plaintiffs.

76. In order to further their goal of cheaply and quickly foreclosing on the Plaintiffs' and Class members' mortgages, the Defendants, through the Mortgage Foreclosure Mill Enterprise, developed an intentional scheme to defraud the Plaintiffs and Class members by submitting perjured affidavits to support foreclosures.

77. Specifically, the affiants in their perjured affidavits claimed to have personal knowledge of the facts averred to in the affidavits, when in reality the affiants had neither read nor had personal knowledge of the facts contained therein.

78. Moreover, the Defendants had full knowledge of the deficiencies in the MERS system, the confusion caused by the repeated transfers and assignments of mortgages and promissory notes, the bundling and securitization of mortgages, and ultimately their own

19

inability to accurately determine the proper holders of mortgages and notes and to locate

documentation sufficient to lawfully foreclose on the Plaintiffs' and Class members' properties.

Despite the knowledge that they often did not have the requisite information and documentation

to lawfully pursue foreclosures, the Defendants, through and in furtherance of the Mortgage

Foreclosure Mill Enterprise, developed a system to pursue foreclosures using knowingly perjured

affidavits, which were submitted to Courts and sent through interstate mails and over interstate

wires.

79.     Defendants' attorneys in the foreclosure actions in which these perjured affidavits

were submitted were aware of the fraud on the court by way of their assistance in conveying

affidavits to the court with knowledge or reckless disregard for the truth that the affidavits in

question were perjured.

80.     Defendants' attorneys' knowledge of the perjury supporting the affidavits that

they submitted to the courts is evidenced by the fact that:

A.     Defendants' attorneys knew that it was impossible for the individuals

signing the affidavits in question to have read and have personal knowledge of the

number of affidavits submitted.

B.     Defendants' attorneys were intrinsically connected to the services offered

by Defendants.

C.     Defendants' attorneys were made aware of several individual instances

wherein an affiant did not have personal knowledge of the substance of the affidavit in

question.

D.     Defendants' attorneys knew that the promissory notes referenced in the

affidavit were not endorsed.

E.     Defendants' attorneys assisted Defendants in creating promissory notes when foreclosures where challenged.

81.     As a result of Defendants' fraud on the courts, Defendants undermined the procedural protections surrounding foreclosure proceedings and were able to foreclose on property much more rapidly, and at a much lower cost, than they otherwise would have been able to.

82.     Plaintiffs and the members of the Class did not have a reasonable opportunity to uncover or expose the fraud committed by way of this racketeering activity.

83.     The Mortgage Foreclosure Mill Enterprise used these perjured affidavits to minimize expenses, and thereby increase profits, by reducing the costs of time and effort for the affiants to locate, verify, and gain personal knowledge of the facts to which they swore, and to increase the speed at which Defendants could foreclose upon the Plaintiffs' and Class members' properties.

84.     These affidavits were signed by "robo-signers," who would routinely sign as many as hundreds of affidavits and other documents in furtherance of foreclosure proceedings in a single day, even though the robo-signers did not personally prepare the affidavits, did not review the affidavits, did not review any of the documentation supporting the statements in the affidavits, and otherwise had absolutely no knowledge of the accuracy of the representations in the affidavits.

85.     For example, on or about April 4, 2008, the Mortgage Foreclosure Mill Enterprise filed the perjured and fraudulent Selman Affidavit in the Davis Foreclosure Case, Indiana, Superior Court, and on or about July 20, 2009, the Mortgage Foreclosure Mill Enterprise filed the perjured and fraudulent Viveros Affidavit in the Davis Foreclosure Case

86. Defendants and the other members of the Mortgage Foreclosure Mill Enterprise knew that the representations in the Selman and Viveros Affidavits were false at the time of such filing, filed the Affidavits with intent to defraud, and intended the Court and Plaintiffs to rely on the Selman and Viveros Affidavits.

87. The Mortgage Foreclosure Mill Enterprise's racketeering activity was facilitated by the use of the mails and electronic wire systems, in that they used the mails to file and serve complaints and other court documents, and used mail, email, and phone communications with one another to facilitate their scheme.

88. The Mortgage Foreclosure Mill Enterprise's racketeering activities had the same or similar purposes, results, participants, victims, and methods of commission, and were interrelated by distinguishing characteristics and not isolated events. The entire course of the Mortgage Foreclosure Mill Enterprise's racketeering activities was to conduct the business of the Mortgage Foreclosure Mill Enterprise through illegal means to increase profits and to churn foreclosures more quickly than they otherwise could have through legal means.

89. The Mortgage Foreclosure Mill Enterprise's racketeering activities have extended over a substantial period of time and have harmed thousands of victims.

**D. Pattern**

90. The Mortgage Foreclosure Mill Enterprise's racketeering activity was carried out hundreds of times a month over the last several years and constitutes an on-going activity.

91. The Mortgage Foreclosure Mill Enterprise will continue to engage in such activity until it is otherwise precluded from doing so.

### E.    Injury to Business and Property

92.    As a result of the Mortgage Foreclosure Mill Enterprise's conduct, the Plaintiff and Class members have been injured in their business and property by being deprived of the use, value, rent, and income of the mortgaged properties that were fraudulently and prematurely foreclosed upon.

93.    The Defendants, through their participation in the Mortgage Foreclosure Mill Enterprise and its racketeering activities, caused injury to the Plaintiffs' and Class' business and property by depriving Plaintiffs and the Class of the use, value, rent, and income of the mortgaged properties that were fraudulently and prematurely foreclosed upon.

## VII.    SECOND CLAIM FOR RELIEF – VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT ("FDCPA"), 15 U.S.C. § 1692

94.    Defendants are "debt collectors" as defined by 15 U.S.C. § 1692a(6).

95.    Defendants filed false, deceptive, misleading, and perjured affidavits in connection with the collections of debts in violation of 15 U.S.C. § 1692e.

96.    Plaintiffs and the members of the Class suffered actual damages from these violations.

97.    Pursuant to 15 U.S.C. § 1692k, Plaintiffs and the members of the Class are entitled to actual damages, statutory damages as set forth therein, and reasonable attorney's fees and costs.

98.    Because the conduct of Defendants was frequent and persistent, because the nature of the violations of the FDCPA were so egregious, because the FDCPA violations were part of a deliberate scheme, Plaintiffs and the Class are entitled to the maximum possible relief permitted under 15 U.S.C. § 1692k(a).

## VIII.   FRAUDULENT CONCEALMENT

99.    Throughout the Class Period, the Mortgage Foreclosure Mill Enterprise intended to and did affirmatively and fraudulently conceal their wrongful conduct and the existence of their enterprise and racketeering activity from Plaintiffs and other members of the Class, and intended that the enterprise be kept secret from the Plaintiffs and the Class.

100.    The Mortgage Foreclosure Mill Enterprise's improper practices and frauds were, by their nature, inherently self-concealing, and the affirmative actions of the Mortgage Foreclosure Mill Enterprise were wrongfully concealed and carried out in a manner that precluded detection.

101.    By virtue of the fraudulent concealment by the Mortgage Foreclosure Mill Enterprise, the running of any statute of limitations has been tolled and suspended with respect to any claims that Plaintiffs and the other Class members have as a result of the Mortgage Foreclosure Mill Enterprise's wrongful conduct alleged in this Complaint.

102.    Plaintiffs and members of the Class could not have discovered the Mortgage Foreclosure Mill Enterprise's  improper conduct and frauds alleged herein at any earlier date by the exercise of reasonable due diligence, because of the deceptive practices and techniques of secrecy employed by the Mortgage Foreclosure Mill Enterprise to avoid detection of and affirmatively conceal their actions.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class Members demand judgment against Defendants as follows:

A.    An order certifying the Class as set forth herein, appointing Plaintiffs as Class Representatives, and appointing undersigned counsel as counsel for the Class;

B.      Threefold damages caused by violations of RICO pursuant to 18 U.S.C. § 1964(c);

C.      Costs and attorneys' fees pursuant to 18 U.S.C. § 1964(c);

D.      Actual and statutory damages for violations of FDCPA pursuant to 15 U.S.C. § 1692k;

E.      Costs and attorneys' fees pursuant to 15 U.S.C. § 1692k;

F.      Pre-judgment and post-judgment interest at the maximum rate allowable by law;

G.      Such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate.

## X.      DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.


DATED: October 19, 2010                    Respectfully submitted,

                                           By: _____
                                           Irwin B. Levin
                                           Richard E. Shevitz
                                           Eric S. Pavlack
                                           Vess A. Miller
                                           Gabriel A. Hawkins
                                           COHEN AND MALAD, LLP
                                           One Indiana Square, Suite 1400
                                           Indianapolis, IN  46204
                                           Telephone: (317) 636-6481
                                           Facsimile: (317) 636-2593
                                           ilevin@cohenandmalad.com
                                           rshevitz@cohenandmalad.com
                                           epavlack@cohenandmalad.com
                                           vmiller@cohenandmalad.com
                                           ghawkins@cohenandmalad.com

*Counsel for the Plaintiffs and Proposed Class*

Clifford T. Rubenstein
MAURER RIFKIN & HILL, P.C.
11550 North Meridian Street, Suite 115
Carmel, IN 46032
Telephone: (317) 844-8372
Facsimile: (317) 573-5564

*Counsel for the Plaintiffs and Proposed Class*